IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 10-cv-00800-RPM

ROBERT FRASER,

Plaintiff,

v.

AVAYA, INC., a Delaware corporation, and
THE AVAYA INC. SICKNESS AND ACCIDENT DISABILITY PLAN,

Defendants.

_____

ORDER ON THIRD CLAIM - ERISA
_____

In the third claim for relief in the complaint, Robert Fraser ("Fraser") alleges violations of 29 U.S.C. § 1133 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* After review of the administrative record, the count finds and concludes that Fraser was not given adequate written notice of The Avaya Inc. Sickness and Accident Disability Plan's denial of his claim for short-term disability benefits and he was not given a reasonable opportunity for a full and fair review of the decision denying his claim. These procedural errors require a reversal of the denial decision and remand of the claim for a full and fair review.

Defendant Avaya, Inc. ("Avaya") was Fraser's employer and the Plan Administrator of The Avaya Inc. Sickness and Accident Disability Plan ("Plan"). SHPS, Inc. ("SHPS") is the Claims Administrator for the Plan.

During the relevant time period, Fraser was a Systems Application Specialist for Avaya on the Tech Help Me team. (DEF 737.) His duties included providing software and hardware consultation services to customers and Avaya employees. (DEF 737, 743.)

On December 10, 2007, Fraser submitted a claim for short-term disability benefits based on a diagnosis of depression (AXIS II) and anxiety (AXIS IV) by Peter Prutch, a nurse practitioner. Treatment consisted of anti-depressants, psychotherapy, and rest. (SHPS 44 & 4.) Prutch wrote his opinion that Fraser was not capable of performing his job because of the functional impairments of severe depression and anxiety. (SHPS 4.)

SHPS authorized short-term disability benefits on December 28, 2007. (SHPS 47.)

Fraser continued to see Prutch and receive psychotherapy and medication. (SHPS 7, 8, 10 & 12.) Prutch recommended long-term disability. (SHPS 10 & 12.)

In May 2008, Fraser began seeing Dr. Stephen Bishop, a psychiatrist. (SHPS 18, 34.) Dr. Bishop diagnosed major depression and anxiety disorder (AXIS I), occupational/financial (AXIS IV), and GAF 45 (AXIS V). Fraser was being treated with psychotherapy weekly and medication. Dr. Bishop stated that Fraser was incapable of performing his job due to impairments of severe concentration problems and extreme anxiety. (SHPS 18.)

SHPS retained Dr. Richard Rewey to perform an IME. He conducted two psychiatric interviews and prepared a May 16, 2008 report. (SHPS 22-27.) In that report, Dr. Rewey summarized Fraser's stressors from work, and noted that his psychiatric medications "appear to be adequate." (SHPS 26.) Dr. Rewey nonetheless recommended regular psychotherapy sessions. Dr. Rewey concluded that "Mr. Fraser remains disabled from being able to perform the essential duties of his job as a systems applications specialist in his previous work environment." (SHPS 26-27.) Dr. Rewey stated that there were interpersonal stresses of the workplace, "which are the specific interpersonal and social factors that I fear that could again flair up his disorders were he again exposed to them." (SHPS 27.)

In August 2008, Fraser was being treated with psychotherapy every other week and medication. (SHPS 32.) His impairments were: "Poor concentration. Very anxious & irritable. Depressed." (SHPS 32.)

On September 12, 2008, Dr. Bishop wrote to SHPS saying that Fraser had improved psychiatrically and could return to work with the accommodation of transferring to a different supervisor and to the Rapid Response Team. (SHPS 34.) At that time, Fraser's case manager at SHPS was Martha Sordahl ("Sordahl"). (SHPS 34.)

In October 2008, Fraser applied for long-term disability benefits based on nurse practitioner Prutch's statement that increasing stress at work caused Fraser depression and anxiety. (SHPS 36.) Prutch stated that Fraser was not totally disabled but required accommodations at work - - a different supervisor. (SHPS 37.)

Sordahl asked Dr. Bishop for a return to work date. (SHPS 35, 38.) In October 2008, Dr. Bishop wrote to Sordahl that Fraser needed an accommodation in place before he could provide a return to work date. (SHPS 40.)

On December 2, 2008, Dr. Bishop wrote that Fraser could return to work full-time, with no restrictions, if he would be accommodated by a transfer to the Rapid Response Team. Dr. Bishop further said that if Fraser was returned to work in his previous position, the stress would drive him back into a disabling depression. (SHPS 39.)

Fraser's request for long-term disability benefits was denied on December 2, 2008. (SHPS 87.)

Fraser returned to work in the Tech Help Me group, reporting to the same supervisor, on December 10, 2008. (SHPS 88.)

In May 2009, Fraser again applied for short-term disability benefits. (DEF 822.) On May 26, 2009, SHPS wrote to Fraser advising that Sordahl would again be his case manager and enclosing a medical release form for him to sign. (DEF 302-304.) That form authorized access to the medical records by any person performing business or legal services on behalf of SHPS or Avaya. Fraser did not sign it.

On June 3, 2009, Dr. Bishop submitted information for Fraser by completing SHPS' Healthcare Provider Report ("HPR"). Dr. Bishop diagnosed Fraser with major depression and anxiety and wrote that although Fraser had improved through the end of 2008, work stress had caused progressive deterioration over the past few months. Dr. Bishop wrote that Fraser's behavioral, psychological, and emotional abilities were impaired. Fraser was being treated with medication. Dr. Bishop again wrote that he believed Fraser needed to transfer to another department. (DEF 839-841.)

Also on June 3, 2009, Dr. Bishop wrote a letter to Sordahl saying Fraser is back to a state of depression and anxiety which prevents him from adequately functioning at work, and that he was medically disabled due to these disorders. (SHPS 842.)

On June 3, 2009, Sordahl reviewed "Return-to-Work 'Best Practice' Guidelines" for major depressive disorder and anxiety. (DEF 836-837.) The guidelines noted outpatient therapy, with symptoms interfering with work, of 14-28 days. (DEF 836.)

On June 3, 2009, SHPS medical director "EMW," Dr. Elliott M. Wolf, a psychiatrist, reviewed Fraser's application. (DEF 3501-02.) After review of the clinical records submitted, including Fraser's previous claim for short-term disability, Dr. Wolf opined as follows: "The primary problem cited then and now is conflict w/ coworker/supervisor, which [also] appear[s]

4

to be view of treating psych, Dr. Bishop, who only sees claimant approx[.] monthly. No current therapist is noted. In my view this is job dissatisfaction, not pysch[.] disability." (SHPS 825.)

Sordahl called Fraser and said that short-term disability must be "based on objective medical findings that support ODGS [Official Disability Guidelines] and inability to perform one[']s job duties and that the HPR completed by Dr. Bishop did not support STD [short-term disability]." (DEF 825.)

Dr. Wolf and Dr. Bishop had a peer-to-peer talk on June 4, 2009. (DEF 826.) Dr. Wolf wrote a note of this conversation, writing that Dr. Bishop acknowledged he is Fraser's advocate, stated that therapy of choice was rest and medication, and that Dr. Bishop did not think therapy is necessary. Dr. Wolf also wrote that, after their call concluded, Dr. Bishop called back and suggested a psychiatric IME. (DEF 826.)

Dr. Wolf advised scheduling a psychiatric IME. (SHPS 826.)

On June 12, 2009, Sordahl advised Fraser that he must sign the medical release form or short-term disability benefits would be denied. (DEF 827-828.)

Fraser submitted a signed, *modified* medical release to SHPS. (DEF 845.) SHPS discussed with Avaya, as the Plan Administrator, whether the modified release would be acceptable. Lisa Hoffman, Avaya Senior Manager for Health & Welfare Benefits, stated the modified form was not acceptable and payment was to be withheld. (Fraser, *e.g.,* 52, 102.)

On June 15, 2009, Sordahl told Fraser that a signed medical release was required to schedule an IME. (DEF 828; Fraser 135-136.)

On June 17, 2009, Sordahl wrote to Fraser that a decision had been made to withhold his disability benefit pay due to "[f]ailure to provide proper documentation, forms approved by Plan

Administrator must not be altered[.]" The letter further said that the requested information - an unmodified release - must be provided by July 1, 2009 or "your benefits may be denied." (DEF 745)

Sordahl wrote a second similar letter dated June 22, 2009, saying disability benefit pay was being withheld because of the failure to provide an unmodified release. The deadline to provide an unmodified release was extended to July 6, 2009 or his "benefits may be denied." (DEF 746.)

On June 24, 2009, Fraser had a telephone conversation with Walt Weathers, a senior product specialist for SHPS. Weathers told Fraser that the failure to provide an unmodified form would result in the denial of benefits, and then Fraser could appeal. (Fraser at 48 and 147, p. 10.)

On June 24, 2009, Fraser signed another medical release form, with fewer modifications. (DEF 781.) Sordahl responded with a June 25, 2009 letter, saying that disability benefit pay was being withheld because the medical release was altered and that his benefits may be denied. She again required receipt of an unaltered release by July 6, 2009. (DEF 747.)

On July 6, 2009, SHPS denied Fraser's application for short-term disability benefits, citing to Article 6.2 of the Plan, with the "specific reason" given as: "[f]ailure to provide proper documentation, the Healthcare Provider's/Physician's Report [medical release] form must not be altered and must be signed as is." The letter advised Fraser of his right to appeal. (DEF 748.)

On July 8, 2009, Sordahl sent Fraser a "Statement of Non-Certification for Disability" letter, which stated "Non-Certification Reason: Disability not clinically supported." The letter also stated "Under the terms of the Avaya Disability Plan, a disability is defined as: 'Refer to

6

your plan summary for your employer's disability definition.'"  Fraser was again notified of his right to appeal.  (SHPS 163-164.)

On July 15, 2009, Dr. Bishop wrote to Sordahl requesting that Fraser's medical leave be reinstated.  He reiterated what he had previously advised SHPS in his letter of June 3, 2009, i.e., Fraser was back to a state of depression, and "relapsed back into a serious and disabling psychiatric condition which resembles the condition that brought about his psychiatric disability a year ago."  (DEF 843.)

Fraser submitted a letter of appeal dated August 3, 2009, confirming his understanding that his claim had been denied because he refused to provide an unaltered medical release and his belief that the non-certification notice which stated that his disability was "not clinically supported" was an attempt to cover up the real issue which was his right to modify the medical release.  (DEF 758.)

The Benefit Claim and Appeal Committee ("BCAC") is the Plan's final review committee, with the authority to uphold or overturn denials of benefits made by SHPS.  (DEF 1050-51.)  The BCAC is required to use appeal procedures that comply with the requirements of ERISA.  (DEF 1050.)

On October 1, 2009, Fraser's counsel submitted a letter to the BCAC, arguing SHPS' decision to deny Fraser's application for short-term disability benefits should be reversed.  (DEF 750-757.)

By letter dated October 21, 2009, Rhonda Murray ("Murray"), as secretary for the BCAC, responded, outlining Avaya's understanding of six "underlying facts," with the last fact as Fraser's refusal to sign an unaltered medical release.  Murray acknowledged that Fraser had a

right under HIPAA to limit access to his medical records but said that if his appeal was to be heard by the BCAC, its voting members and their advisors needed access to Fraser's medical records. Accordingly, Murray told Fraser he "must" return a signed, unaltered Avaya release in order to appeal. Fraser was also advised he could submit additional supporting documentation. (DEF 798-800.)

Fraser's counsel forwarded a modified release to the BCAC's legal advisor Ron Hershkowitz on November 30, 2009, which release the defendants represented was negotiated between counsel. (DEF 803-804.)

On December 3, 2009, Murray, on behalf of the BCAC, provided Fraser two options: 1) sending Fraser for an IME and a new certification determination would be made. If the determination remains denied, Fraser's appeal would be put on the agenda for the next month's BCAC meeting; or 2) Fraser's appeal would be presented to the BCAC on December 10, 2009, without an IME. (DEF 805.)

On December 4, 2009, Fraser's counsel responded that Fraser wished to proceed with the second option, stating "we believe that it is the only option the BCAC can pursue, based on this record." Fraser's counsel reiterated his contention that SHPS' decision to deny short-term disability benefits was based solely on the contents of the medical authorization form that Fraser signed. (DEF 807.)

Sordahl prepared a Case Management/Case Summary dated December 4, 2009 for the BCAC's review. She listed four specific reasons for SHPS' non-certification, including that the SHPS medical director determined the objective medical information did not support short-term disability benefits and, in his view, the problem was job dissatisfaction; and that the treatment

plan/level of care did not support the diagnosis of major depression because Dr. Bishop only saw Fraser approximately monthly and psychotherapy was not part of the treatment plan. (DEF 809.)

Sordahl also included a chronological summary of Fraser's case, clearly stating that Fraser's claim was denied "due to his failure to provide an unaltered signed MRF [medical release form]." (DEF 811, 7/14/09 entry.)

Murray also prepared a summary of Fraser's case for the BCAC, essentially mirroring what Sordahl provided in her summary. Murray described Fraser's duties as follows: "Provides hardware and software consultation services to customer and other Avaya employees. Interprets error messages, instructs clients in use of equipment and applications, documents problem resolution, and escalates unresolved problems to higher level support." (DEF 737.) He worked independently with minimum supervision. (*Id.*)

Murray wrote that the issue was whether Fraser could perform the essential functions of his job; the BCAC's decision was to be based solely on the objective medical evidence; if there was insufficient medical evidence to deny Fraser's claim, the denial must be rescinded; and Fraser's failure to sign the medical release was not a sufficient justification for denying Fraser disability benefits. (DEF 740-741.)

Murray also provided the BCAC with the June 17, 22, and 25, 2009 letters withholding benefits and stating benefits may be denied if Fraser did not provide an unaltered medical release, and the July 6, 2009 letter denying benefits because Fraser did not provide an unaltered medical release. Notably absent is SHPS' "Statement of Non-Certification for Disability" letter of July 8, 2009. (DEF 741-742.)

The BCAC heard Fraser's appeal on December 10, 2009. (DEF 915-917.) Ron

Hershkowitz, BCAC's legal advisor, instructed the voting members to base their determination on the objective medical evidence and to disregard any references to Fraser's failure to sign an unaltered medical release. (DEF 915)

The BCAC's medical advisor was Dr. Joe Clemente, board-certified in internal medicine. (DEF 915, 3503-06.) He provided general information about major depression and anxiety to the BCAC prior to its review. (DEF 904, 812-821.) Dr. Clemente said Fraser could have major depression based on the medication he was taking, opined that Fraser's treatment "should have been more intense, more regularly scheduled psychiatric appointments and monitoring of medication," and that he believed the "disagreement between Dr. Bishop and the SHPS doctor was the core issue of the appeal." (DEF 916.)

Among the specific issues considered by the BCAC were: 1) the fact that SHPS denied Fraser's claim because of objective medical evidence and not because of the medical release controversy; and 2) Fraser was offered an IME but declined. (DEF 916.) The issue to be resolved by the BCAC was whether "the denial of SADBP [Sickness and Accident Disability Plan] from May 29, 2009, through and including July 5, 2009, be rescinded." (DEF 742.)

The BCAC denied Fraser's appeal based on its determination that:

1. The objective medical evidence did not support a disability.

2. Mr. Fraser's psychiatrist['s], Dr. Bishop, statement that a transfer to another department under another supervisor would be sufficient for Mr. Fraser to return to work was not consistent with a psychological disability.

3. Mr. Fraser's treatment plan did not support a finding of Major Depression.

4. Mr. Fraser was given the opportunity to have an Independent Medical Examination (IME).

(DEF 916-917.) Fraser then filed this civil action.

Under the Plan, a participant files a written claim for benefits with the claims administrator, here, SHPS. SHPS reviews and approves or denies payment of disability benefits. SHPS is also required to do the following:

> If the Claims Administrator . . . denies a claim in whole or in part, the denial shall be written in a manner calculated to be understood by the claimant and shall include:
>
> > (a) The specific reason or reasons for the decision;
> >
> > (b) References to specific Plan provisions on which the decision is based;
> >
> > (c) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; . . . .

(DEF 1048.)

If a claim is denied, the claimant may submit a written request for review by the BCAC. The BCAC has "the authority to uphold or overturn denials." (DEF 1051.) The BCAC reviews the "initial decision" made by SHPS. (DEF 1049.)

> In reviewing the initial decision, the BCAC must not give any deference to the initial decision and must consider all information relevant to the claim, not just information relied upon (or available) when the original decision was made. . . .
>
> If the decision is based in whole or in part on a medical judgment, the BCAC <u>must consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment issue</u>; provided that such health care professional consulted must be an individual who is neither an individual who was consulted in the connection with the initial claim denial that is the subject of the appeal. . . .

(DEF 1049; emphasis added.) The BCAC "shall use appeals procedures that comply with the requirements of ERISA." (DEF 1050.)

11

> Under ERISA, every employee benefit plan shall:
>
> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
>
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.

The regulations provide "the plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination." Among other things, the notification shall set forth "(i) The specific reason or reasons for the adverse determination; (ii) Reference to the specific plan provisions on which the determination is based; (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; . . ."  29 C.F.R. § 2560.503-1(g).

The Plan's denial letter of July 6, 2009 stated the reason was the failure to provide an unaltered medical release, and referred Fraser to Article 6.2 of the Plan.  Article 6.2 of the Plan states that a participant will not be entitled to benefits if he refuses or fails to periodically submit to a medical examination.  (DEF 1042.)  The Plan does not contend that Fraser refused to submit to an IME.  The defendants admit that Fraser's failure to sign an unaltered medical release is insufficient justification for denying Fraser benefits.  (DEF 741.)  This written notice fails to comply with the notice requirements of § 1133 and it is not a lawful reason to deny benefits.

The Plan's "Statement of Non-Certification for Disability" dated July 8, 2009 is also defective.  The stated reason was "[d]isability not clinically supported" and referred Fraser to the definition of "disability" in the plan summary.  (SHPS 163.)  The Plan's argument of substantial

compliance in reliance on this letter and *oral* communications made on June 3 and 15, 2009 is unavailing.

Section 1133 and the corresponding regulation require *written* notification, and the oral communications were made before the Plan sent several letters threatening denial if an unaltered release was not signed and before it issued the July 6, 2009 letter denying benefits because of the altered release.  Fraser was not advised in the June 15, 2009 conversation that the medical documentation provided did not support disability.  The reasons given in Sordahl's December 4, 2009 case summary to the BCAC were not disclosed to Fraser in the July 8, 2009 letter. (DEF 809.)  The earlier oral communications relied on are also contradicted by the final event identified by Sordahl in her case summary: on July 14, 2009, Fraser was advised by email that "denial was due to his failure to provide an unaltered signed MRF." (DEF 811.)

The Plan failed to provide Fraser with a notice that was sufficient to permit him to engage in a meaningful appeal of the adverse determination.

ERISA requires a claimant/participant be provided a full and fair review of a claim and an adverse benefit determination.  This includes providing a claimant the opportunity to submit written comments, documents, records and other information relating to the claim for benefits (29 C.F.R. § 2560.503-1(h)(2)(ii)); a review that does not afford deference to the initial adverse benefit determination (§ 2560.503-1(h)(3)(ii)); and that consultation be with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment (§ 2560.503-1(h)(3)(iii)).

The BCAC consulted with Dr. Clemente who provided the BCAC with "general clinical information about depression and anxiety, not a case-specific analysis" of Fraser's case.

(Response, p. 19; DEF 812-821.)  This clinical information was not provided to Fraser until after his appeal to BCAC.

Fraser was being treated by a psychiatrist.  SHPS consulted with a psychiatrist (Dr. Wolf) and had previously retained a psychiatrist (Dr. Rewey) to conduct an IME of Fraser.  The BCAC consulted with Dr. Clemente, a board-certified internist, to render an opinion about Fraser's major depression and anxiety diagnoses and treatment.  Dr. Clemente did not have the appropriate training and experience in mental health treatment as required by the Plan and ERISA.

Fraser's 2008 disability leave was relevant to his 2009 claim.  The defendants concede that BCAC's responsibility was to "review all the information available in a case." (Response, p. 27.)  The defendants failed to identify any evidence in the record where the documentation from Fraser's 2008 claim, and specifically, Dr. Rewey's IME report, was provided to or considered by the BCAC or its medical advisor.  That report supported Fraser's earlier claim even though his treatment consisted only of psychotropic medications and no psychotherapy.

The denial decision is reversed because of these procedural errors.  The appropriate remedy is a remand for reconsideration after giving Fraser an opportunity to submit further support for his claim.  The medical evidence in this record is not sufficient to support a finding by this court that he is entitled to benefits.

No final judgment shall be entered in this case because of the other claims still pending.

IT IS SO ORDERED.

DATE:   March 15, 2011

                              BY THE COURT:

                              s/Richard P. Matsch

                              _____

                              Richard P. Matsch, Senior Judge